Qaid Rafeeq AZEEZ, Abdullah Muhammad, Plaintiffs,

v.

James W. FAIRMAN, et al., Defendants.

No. 81–2184, 81–2185.

United States District Court, C.D. Illinois, Danville Division.

Jan. 22, 1985.

---

360

Qaid Rafeeq Azeez, pro se.

Abdullah Muhammad, pro se.

Steven Kehoe, Asst. Atty. Gen., Chicago, Ill., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL ORDER

BAKER, Chief Judge.

The plaintiffs, Qaid Rafeeq Azeez and Abdullah Muhammad, who are inmates of the Illinois Department of Corrections, complain that the defendants' policy of using the plaintiffs' "committed names", Stanley Russell and Jessie Fields, respectively, and punishing the plaintiffs for their refusal to use or respond to their committed names, unconstitutionally restricts their expression and exercise of their religious beliefs. The defendants, J.W. Fairman, J.E. Wright, and A. Dodge are administrators and correctional officers of the Illinois Department of Corrections. At the times of the occurrences complained of, the plaintiffs were residents of the Pontiac Correctional Center. The plaintiffs testified to disciplinary proceedings and denial of privileges associated with their use of their Muslim names. The plaintiffs argue that the Department of Corrections has shown no compelling state interest in refusing to acknowledge the plaintiffs' religiously based name changes. Thus, the plaintiffs claim that the defendants unreasonably restricted their religious freedom.

The defendants assert that the "committed name" policy is based on the institutional concerns of security and administrative efficiency. According to the defendants,

Muslim name changes are a "matter of personal opinion" and not a "religious necessity." Thus, balancing the correctional interests and the inmates' religious needs, the defendants claim that they have not unduly restricted the plaintiffs' religious practices. The defendants state that the policy of granting identification cards and maintaining records with an a/k/a (also known as) designation grants sufficient recognition to the plaintiffs' new names. In addition, the defendants claim they are entitled to official immunity.

## I.

The plaintiffs testified, and the court finds, that members of the Muslim community, upon embracing Al Islam, commonly adopt new names which reflect an "attribute of God" and which signify their new commitment. This practice has a basis in the Quran, and Wallace D. Muhammad, the chief minister of the nation of Islam, has urged the Muslim faithful to follow it. *See* Attachments to Plaintiffs' Memo of Law.

Both plaintiffs have adopted Muslim surnames since their incarceration. The plaintiff Muhammad testified that he has been an adherent of Islam since the 1960's, but did not change his name until his commitment to the Department of Corrections. The plaintiff Azeez has been through an Illinois judicial proceeding based on statute which resulted in a court order formally changing his name. Plaintiffs' Exhibit 2. These name changes are a result of the plaintiffs' sincere adherence to Al-Islam, and these name changes have religious significance to them.

Richard Ores, the identification supervisor at Pontiac, issued an identification card to Azeez, following his change of name, bearing only his Muslim name. The prison administrators then decided that an a/k/a designation should be used on the plaintiffs' identification cards. The policy of the Department of Corrections was to recognize only "committed names". Defendants' Exhibits A–13, A–14, and M–3. The plaintiffs insisted that they wanted identification cards bearing only their Muslim names. The defendants, however, offered evidence, and the court finds, that the plaintiffs each accepted identification cards bearing both their Muslim and committed names during June of 1981. Plaintiffs' Exhibits 8–9. The plaintiffs also insist that their institutional records should bear their Muslim names. Plaintiffs' Exhibits 18–19.

However, the writ of mandamus issued by the state court commanding prison officials to recognize and honor plaintiff Azeez's new name, further orders that no changing of institutional records is required. Plaintiffs' Exhibit 2. The defendant, J.W. Fairman, who was Warden at Pontiac at the time, ordered that the plaintiffs were to use "committed names" on all institutional documents but could use their new religious names in addition to their committed names. Plaintiffs' Exhibits 18–19.

The defendants justify the disciplinary action against the plaintiffs on the ground that the plaintiffs refused to obey valid orders. In addition, the defendants point out that the plaintiff Muhammad disfigured his identification card and threatened the institutional staff. Plaintiffs' Exhibit 33.

The plaintiffs testified that they were denied access to the law library, Plaintiffs' Exhibits 10, 11, and 23, the commissary, Plaintiffs' Exhibits 4–7, 19 and 28, "sick call," the clothing room, religious activities, Plaintiffs' Exhibits 15 and 21, and notary services, Plaintiffs' Exhibit 27, and that their identification cards were confiscated, Plaintiff's Exhibit 20, because of the defendants' refusal to recognize the plaintiffs' name changes. The defendants offered evidence that privileges were refused only when the plaintiffs refused to sign their "committed names" along with their Muslim names.

## II.

The defendants seemed to claim at trial that the plaintiffs occupied different positions in this case because the plaintiff Muhammad had not obtained a court order changing his name. That claim is

without substance. The Illinois statutory provisions regarding name changes, Ill. Rev.Stat. ch. 96, are only permissive and do not abrogate the common law right to change a name without a formal application. *Reinken v. Reinken*, 351 Ill. 409, 184 N.E. 639 (1933); *see also Thomas v. Thomas*, 100 Ill.App.3d 1080, 1081, 56 Ill.Dec. 604, 427 N.E.2d 1009 (1981). The common law name change is valid, however, only if the change does not interfere with the rights of others by serving a fraudulent purpose. *Chaney v. Civil Service Commission*, 82 Ill.2d 289, 294, 45 Ill.Dec. 146, 412 N.E.2d 497 (1980). The defendants made no showing of any fraudulent purpose behind the plaintiff Muhammad's name change, although they alleged generally that name changes could be confusing. That argument goes more toward the defendants' institutional security and efficiency arguments justifying a "committed name" policy rather than to show a requirement for Muhammad to change his name in a court proceeding. The plaintiffs stand on the same footing as each other in this case.

The defendants also dispute, to a certain extent, the reasons underlying the plaintiffs' name changes. In particular, plaintiff Muhammad, a long-time adherent of Islam, was questioned as to why it took him so long to change his name. Muhammad testified as to the use of "X" by followers of Malcolm "X" to signify cancellation of the names used prior to accepting Islam. Muhammad said that current religious practice requires the use of an Islamic name. The defendants argue that Muslim name changes are "purely a matter of personal opinion and not a matter of religious necessity". The defendants state many Muslims have never changed their names. Defendants' Brief, Page 4.

■ In *Masjid Muhammad-D.C.C. v. Keve*, 479 F.Supp. 1311 (D.Del.1979), the leading reported case regarding Muslim name changes among prisoners, the district court discussed change of name and its role within Islam. The court stated that "protected religious expression encompasses more than orthodox or institutionalized practices." *Id.* at 1323. "To be protected, a particular form of religious expression need not be mandated by one's religion or even endorsed by a majority of its adherents, so long as it is an expression of a sincere, religiously based conviction." *Id.* See also *Stevens v. Berger*, 428 F.Supp. 896, 899 (S.D.N.Y.1977); *Theriault v. Silber*, 391 F.Supp. 578, 580 (W.D.Tex.1975). Neither federal courts nor prison administrators are authorized to determine the orthodoxy of religious beliefs and expressions. *Masjid Muhammad*, 479 F.Supp. at 1323; *see also Fowler v. Rhode Island*, 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953); *Teterud v. Burns*, 522 F.2d 357, 360 (8th Cir.1975).

The recent case of *Salahuddin v. Coughlin*, 591 F.Supp. 353 (S.D.N.Y.1984), is distinguishable. In *Salahuddin*, two plaintiffs testified that they did not use their Muslim names consistently and that use of their committed names was not religiously offensive to them. Another plaintiff had used several Muslim names and desired future Muslim name changes at his whim. *Id.* at 358. Accordingly, the court upheld the policy of recognizing only statutory name changes in order to avoid confusion and simplify record keeping. *Id.* at 359.

■ The plaintiffs' testimony in this case revealed that acknowledgment of their non-Muslim names is religiously offensive to them. The plaintiffs testified that their Muslim names reflect their new spiritual identities and the types of lives they hope to lead. They interpret the Quran as condemning the use and recognition of their old surnames. Inconsistency of religious practice among Muslims regarding the adoption of religious names and the acknowledgment due to previous non-Muslim names certainly is not fatal to the plaintiffs' case. See *Masjid Muhammad*, 479 F.Supp. at 1323. Thus, the adoption of new Muslim names is part of the practice of the plaintiffs' Islamic faith and is sufficient to invoke First Amendment protection. See *Africa v. Pennsylvania*, 662

F.2d 1025, 1029–30 (3rd Cir.1981). In addition, no evidence was received that the plaintiffs were not using their adopted Muslim names in a consistent manner.

The defendants further assert that the "committed name" policy, including the use of a/k/a designations, serves a compelling state interest in institutional security and efficient prison administration. The defendants claim that the institutional interest in "maintaining security against confusion and misidentification and preventing the potential for the change of names for fraudulent purposes" outweighs the plaintiffs' interest in free religious expression.

■■■ To establish a violation of religious rights, a prisoner must prove that a legitimate religious practice is being unduly restricted by prison policy or regulations. *Chapman v. Pickett*, 491 F.Supp. 967, 971 (C.D.Ill.1980), *rev'd other grounds* 645 F.2d 73 (7th Cir.1980), *rev'd other grounds*, 676 F.2d 697 (7th Cir.1982). The government then must show that the restriction arises from a compelling state interest in security, discipline, or administration, and that it is among the least restrictive means *reasonably* available to prison officials. *Id.* (Emphasis added.) Security, discipline, and administration are, by definition, compelling state interests. *Id.*

■■■ In addition, the Seventh Circuit in *Madyun v. Franzen*, 704 F.2d 954 (7th Cir.1983), held that prison rules which incidentally restrain the free exercise of religion are justified only if the regulation has an "important objective" and the restraint on religious liberty is "reasonably adapted" to achieving that objective. *Id.* at 959–60. Prison officials may legitimately impose restrictions on religious practices which would be unconstitutional in other settings. *Childs v. Duckworth*, 705 F.2d 915, 920 (7th Cir.1983). The issue is whether the restrictions are needed for the achievement of legitimate correctional policies and goals. *Id.; see also Pell v. Procunier*, 417 U.S. 817, 827 (1974). The *Chapman* factors of security, discipline, and administration may be presumed to be "important objectives" within the holding of *Madyun*.

Of course, prison officials generally are entitled to judicial deference in the administration of their institutions. *Bell v. Wolfish*, 441 U.S. 520, 540, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979).

■■■ Prison officials, however, must allow "a reasonable opportunity" for a prisoner to pursue his religious faith. *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam). What constitutes "a reasonable opportunity" must be evaluated in light of the institutional interest in security. *See Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). A restriction impinging on First Amendment rights must be carefully scrutinized to determine the extent to which it is needed to effectuate institutional policies and goals. These institutional goals must be accommodated with prisoners' interests in their First Amendment right to adhere to their faiths. *Childs v. Duckworth*, 705 F.2d 915, 920 (7th Cir.1983). As in *Masjid Muhammad*, however, it does not follow that the plaintiffs are entitled to have prison officials use their new names for *all* purposes. The free exercise clause protects one's own religious expression and restricts the activities of others only to the extent needed to afford that protection. *Masjid Muhammad-D.C.C. v. Keve*, 479 F.Supp. 1311, 1324 (D.Del.1979). A state, however, may identify its citizens by any method it chooses for its own record keeping purposes, even though the method may be offensive to some. *Id.*

■■■ Prison officials are entitled to deference as to how they keep the institutional records of the plaintiffs, even though many prisoners are committed with more than one name or alias. In addition, the state court mandamus order provided that prison officials were not required to alter any records after the name change of plaintiff Azeez. The plaintiffs are not entitled to relief requiring the defendants to use Muslim names for institutional record keeping purposes. *See Barrett v. Virginia*, 689 F.2d 498, 503 (4th Cir.1982); *Akbar v.*

*Canney,* 634 F.2d 339, 340 (6th Cir.1980) (per curiam).

■■■ The defendants, however, have required the plaintiffs to use religiously offensive, non-Muslim names to describe themselves under the threat of punishment or the withdrawal of privileges. To justify such a requirement, the defendants must show that it is "reasonably adapted" to achieving an important institutional objective. *See Madyun v. Franzen,* 704 F.2d 954, 959–60 (7th Cir.1983). The district court in *Masjid Muhammad* stated that, since the First Amendment protects an inmate's right to legal recognition of an adopted religious name, prison authorities may not condition the receipt of services or benefits on waiving such a right absent a compelling state interest. *Masjid Muhammad,* 479 F.Supp. at 1324; *see Akbar v. Canney,* 634 F.2d 339, 340 (6th Cir.1980) (per curiam); *Salahuddin v. Carlson,* 523 F.Supp. 314, 316 (E.D.Va.1981). The "committed name" policy was used occasionally in such a manner, according to the testimony and several exhibits received at trial. The plaintiffs were denied access to the commissary, the law library, "sick call", the clothing room, religious activities, and notary services because their Muslim names appeared on call slips or other forms. *See* Transcript Testimony of Azeez and Muhammad and Plaintiffs' Exhibits 4–7, 10–11, 15, 19, 21, 23, 27, and 28. The plaintiffs are entitled to relief for those violations.

■■■■ Similarly, the state may not compel a citizen to choose between engaging in conduct or expression which is religiously offensive or being punished. *Masjid Muhammad,* 479 F.Supp. at 1325. Again, absent an important objective and a policy reasonably tailored to the achievement of that objective, a state may not punish an inmate for failing to acknowledge a particular name or for failing to perform a task where to do so would involve the acknowledgment of a religiously offensive name. *Id.* This reasoning does not mean that the plaintiffs are free to disregard orders whenever a staff member

fails to use the Muslim names or that they may not be disciplined if they disregard such orders. Similarly, prisoners are not free to act disrespectfully or create disorder when their non-Muslim names are used. *Id.* It simply means that an inmate may not be disciplined for his failure to *acknowledge* his non-Muslim name. *Id.*

■■■ Plaintiff Azeez stated that he was disciplined for failing to acknowledge his old surname and had his identification card confiscated by Officer Dodge. Plaintiffs' Exhibit 20. Again, relief is proper for this incident involving the forced acknowledgment of the non-Muslim name.

■■■ The court concludes that the a/k/a designations for the receipt of privileges and record keeping is a reasonable middle ground between absolute recognition of the plaintiffs' Muslim names and the prison interests of order, security, and administrative efficiency. Prison officials at Pontiac started the use of a/k/a designations for the plaintiffs due to the incidents which form the basis of this civil rights action. The plaintiffs have accepted identification cards bearing both their "committed" and Muslim names. The a/k/a policy seems reasonably related to the need for accurate record keeping and its effect on order within the institution, i.e., keeping track of the inmates and their transactions. The policy also recognizes the name changes. In *Masjid Muhammad,* the religious names were given no recognition at all. The a/k/a policy may be viewed as reasonably related to the institutional interest of order and administration, the pursuit of which incidentally restricts the plaintiffs' religious expression.

### III.

■■■ The defendants are not entitled to official immunity in this case. The plaintiffs, to overcome a claim of qualified immunity, must show that their rights were clearly established at the time of the challenged conduct. The reasonableness of the defendants' conduct must be measured by reference to clearly established law. No

other circumstances are relevant to the issue of qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Davis v. Scherer,* —— U.S. ——, ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984). *Crowder v. Lash,* 687 F.2d 996, 1006–1007 (7th Cir.1982).

In *Chapman v. Pickett,* 491 F.Supp. 967 (C.D.Ill.1980), *rev'd on other grounds* 645 F.2d 73 (7th Cir.1980), *rev'd on other grounds* 676 F.2d 697 (7th Cir.1982), the court established a test for determining when a prisoner's religious beliefs have been violated. A plaintiff must show that a legitimate religious practice is being unduly limited by prison regulations. The burden of proof then shifts to the government to show that the inference arises from a compelling state interest in prison security, discipline, or administration, and that it is among the least restrictive means *reasonably* available to prison officials. *Id.* at 971. (Emphasis added.) Security, discipline, and efficient administration are, by definition, compelling state interests. *Id.* at 971 n. 1.

■■■ This test, established more than four years ago, can be viewed as removing any objective belief in immunity for the challenged conduct in this case. It is well-settled law that first amendment rights have a preferred status. *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). In addition, the Seventh Circuit in *Madyun v. Franzen,* 704 F.2d 954 (7th Cir.1983), further refined the examination of potential violations of prisoners' religious rights. Incidental restrictions on prisoners' religious practices are justified only if the restriction has an "important objective" and the restraint on religious liberty is "reasonably adapted" to achieving that objective. *Id.* at 959–60. The defendants cannot claim official immunity for their alleged actions in light of these well-established standards within the Seventh Circuit.

## IV.

■■■ The plaintiffs are entitled to damages for the substantive constitutional violations. The district court in *Masjid Muhammad* awarded the plaintiffs nominal damages of $1.00 each for their constitutional injuries, pursuant to the holding in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The Seventh Circuit, however, has held that the rationale of *Carey* applies only to procedural due process violations, and not to violations of substantive constitutional rights. *Owen v. Lash,* 682 F.2d 648, 653 (7th Cir.1982). Damages can be presumed where there is an infringement of a substantive constitutional right. *Lenard v. Argento,* 699 F.2d 874, 889 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). The court should consider compensation for harm, if any, resulting from the constitutional violation and appropriate compensation for the constitutional violation itself. *Walsh v. Brewer,* 733 F.2d 473, 477 (7th Cir.1984).

In *Crawford v. Garnier,* 719 F.2d 1317 (7th Cir.1983), the Seventh Circuit distinguished *Lenard* and *Owen* and listed elements of compensable injury for substantive constitutional violations, including humiliation and personal indignity. *Id.* at 1324–1325; *see also Kincaid v. Rusk,* 670 F.2d 737, 746 n. 16 (7th Cir.1982). In this case, the plaintiffs suffered affronts to their religious faith and personal dignity because of the defendants' failure to recognize their Muslim names. Accordingly, the plaintiffs' injuries fall within the elements enumerated in *Crawford* and are compensable. *See also Grimes v. Smith,* 585 F.Supp. 1084, 1093 (N.D.Ind.1984) (Posner, Circuit Judge, sitting by designation).

■■■ Declaratory relief under the circumstances is also appropriate. *See Chapman v. Pickett,* 586 F.2d 22, 26 (7th Cir. 1978). While not specifically requesting declaratory relief in their complaints, the plaintiffs request that the defendants acknowledge their adopted Muslim names. The court construes this request as one for declaratory relief and finds that the plaintiffs are entitled to such relief. *See* F.R. Civ.P. 54(c). Accordingly, the plaintiffs' adopted Muslim names are entitled to First Amendment protection as an integral part of the plaintiffs' Muslim faith and religious

practices. The plaintiffs are entitled to use these names without the threat of punishment or the withdrawal of privileges.

The plaintiffs' claim for injunctive relief is moot. The plaintiffs have accepted identification cards bearing both their Muslim and "committed names" and the court has concluded that the "a/k/a policy" does not work a First Amendment violation. The court also has concluded that the plaintiffs have no constitutional right to require the defendants to alter institutional records. In addition, the plaintiffs apparently are no longer at Pontiac. Azeez is at Stateville, and Muhammad is either at Stateville or Logan.

IT IS THEREFORE ORDERED that judgment be entered in favor of the plaintiffs and against the defendants in the sum of $300 for the deprivation of their religious liberties.

IT IS FURTHER ORDERED and declared that the plaintiffs' adopted Muslim names are entitled to First Amendment protection as limited in this memorandum opinion.

IT IS FURTHER ORDERED that the plaintiffs' claim for injunctive relief be, and hereby is, denied.

Clerk to enter judgment accordingly.